UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| PAUL BUTLER,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>PORSCHE CARS NORTH AMERICA, Inc.,<br><br>　　　　　Defendant. | Case No. 16-CV-2042-LHK<br><br>**ORDER DENYING MOTION FOR CLASS CERTIFICATION**<br><br>Re: Dkt. No. 44 |

Plaintiff Paul B. Butler ("Plaintiff") brings the instant putative class action against Defendant Porsche Cars North America, Inc. ("Defendant" or "Porsche") for violation of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, et seq. ("CLRA") and California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq. ("UCL"). Before the Court is Plaintiff's motion for class certification. The Court finds this matter appropriate for determination without oral argument and hereby VACATES the motion hearing set for April 20, 2017. Civil L. R. 7-1(b). Having considered the submissions of the parties, the relevant law, and the record in this case, the Court DENIES Plaintiff's motion for class certification.

# I.    BACKGROUND

## A.    Factual Background

Plaintiff is a California resident and seeks to represent a class and a sub-class of statewide consumers who purchased a 2005–2008 Porsche 911 (alternatively called "Porsche 997") vehicle manufactured before February 2008 (hereinafter, "Class Vehicles"). Plaintiff alleges that the wiring harness in all Class Vehicles, which is used to connect the vehicle's alternator and battery in order to allow the alternator to recharge the car's battery, is defectively designed.

### 1. Plaintiff's Experience with the Wiring Harness Defect

Plaintiff owns a 2007 Porsche 911 S C2 Cabriolet. ECF No. 37 (First Amended Class Action Complaint, or "FAC"), at ¶ 6. Plaintiff purchased his vehicle used from Stevens Creek Porsche, a Porsche factory authorized dealership in Santa Clara, California, on July 18, 2015. *Id.*; *see Butler v. Porsche Cars N.A., Inc.*, 2016 WL 4474630, at *1 (N.D. Cal. Aug. 25, 2016). Plaintiff's vehicle was sold to its original owner on May 27, 2007. *See* FAC, Ex. 1.

When Plaintiff's vehicle reached approximately 78,000 miles, Plaintiff "found that the key remained stuck in his vehicle and the car would not start." *Id.* ¶ 6. Plaintiff brought his vehicle to Stevens Creek Porsche for inspection and repair. *Id.* The mechanic found that Plaintiff's battery "was insufficiently charged." *Id.* The mechanic replaced the alternator, but the battery continued to charge insufficiently. *Id.* The mechanic eventually found that the problem was caused by a faulty wiring harness in Plaintiff's vehicle. *Id.* The mechanic replaced Plaintiff's wiring harness, and charged Plaintiff $3,180.44 for the repair. *Id.*

### 2. The Nature of the Alleged Defect

According to Plaintiff, Class Vehicles suffer from a defective wiring harness which connects the vehicle's alternator to the battery. This wiring harness is necessary to recharge the battery from the alternator during the vehicle's operation. The wiring harness "is comprised of two pieces of copper cable, connected by a [brass] terminal lug mounted on the starter." *See* Opp. at 9; ECF NO. 53-4 ("Meltzer Decl."), ¶ 5.

On August 11, 2007, Ken Gould ("Gould"), an employee at Porsche, investigated the wiring harness problem and prepared a report on the source of the problem. ECF No. 45-6 ("Gould Report"), at 2. Gould explained that the wiring harness was "overheating at the starter

United States District Court
Northern District of California

terminal lug," which caused the "cable insulation near the starter terminal lug and the rubber protective cover on the lug to melt." *Id.* This resulted "in a reduced battery charge voltage," leading to "discharge[] to the point that vehicle engine w[ould] not start." *Id.* Gould conducted an investigation on the wire harnesses and concluded that "[t]he root cause for the wire harness failure appears to be a poor electrical connection between the 25 mm stranded copper wire and the brass alloy terminal lug that connects the 25 mm and 35 mm cables and provides power to the starter when subjected to higher current loads." *Id.* at 4. Gould explained that "[t]he poor electrical connection is probably the result of the much lower electrical conductivity of the brass terminal (28%) when compared to copper and less than perfect crimping of the [brass] terminal to the 25 mm [copper] cable." *Id.* Gould further also stated that "[t]he use of a 25 mm stranded copper cable to carry the potential current capacity of the 150 ampere alternator is questionable as well." *Id.*

In November 2007, following completion of the Gould report, Eric Meltzer ("Meltzer"), an engineer at Porsche, "escalated the issue" to the manufacturer of Porsche-brand motor vehicles, Dr. Ing h.c. F. Porsche AG ("Porsche AG"). Meltzer Decl. ¶ 9. Meltzer's report largely repeated the findings and conclusions of the Gould report. *See* ECF No. 50-5.

Meltzer also "drafted an Advanced Technical Information ("ATI") that was published to Porsche authorized dealerships on January 30, 2008." Meltzer Decl. ¶ 10. "The ATI advised dealers that the Cable may be the cause of" customer complaints regarding battery discharge. *Id.*

Also in January 2008, Porsche instituted two "countermeasures" to correct for the faulty wiring harness. ECF No. 45-5 ("Meltzer Dep."), at 5. First, because Porsche learned that the wire defect was a result of a "process abnormality" at the supplier, Porsche corrected the abnormality "at the supplier." *Id.* at 5. Porsche also implemented a "second countermeasure" whereby Porsche made changes to the wiring harness itself. *Id.* Thus, beginning in January 2008, Porsche "used a next-generation" wiring harness. *Id.* Accordingly, Porsche 911 vehicles manufactured after January 2008 contain a different wiring harness than Porsche 911 vehicles manufactured before January 2008. *Id.*

### 3. Porsche's Omissions About the Wiring Harness Defect

Plaintiff alleges that Porsche knew about the defect "by the time that Plaintiff's 2007 model year was first sold," as evidenced by the ATI that Porsche issued to dealerships in January 2008. *Id.* ¶ 13. Plaintiff also alleges that Porsche received numerous customer complaints and "a host of message boards for aggrieved Porsche owners has arisen online" about the defect. *Id.* ¶¶ 9, 13.

Plaintiff alleges that, although Porsche issued the ATI to dealerships, Porsche "never made any disclosure to consumers or the putative class members about the defect plaguing the Class Vehicles." FAC ¶ 13. Moreover, although Porsche changed the wiring harness for vehicles manufactured after January 2008 "that no longer presents the alleged defect," Porsche "took no action with respect to the Class Vehicles." *Id.* ¶ 15.

### B. Procedural History

Plaintiff filed a class action lawsuit against Porsche on April 19, 2016. ECF No. 1. Plaintiff alleged causes of action under the CLRA and UCL. *Id.*

Porsche moved to dismiss the complaint on June 3, 2016. ECF No. 12. Specifically, Porsche argued that Plaintiff did not sufficiently allege that Porsche had a duty to disclose the defect; that Plaintiff failed to sufficiently plead Porsche's knowledge at the time of sale; and that Plaintiff did not sufficiently plead that Plaintiff engaged in a "transaction" with Porsche for purposes of the CLRA. *Id.* Porsche also asserted that Plaintiff lacked standing to seek injunctive relief. *Id.* Plaintiff filed an opposition to Porsche's motion to dismiss on June 17, 2016, ECF No. 19, and Porsche filed a reply on June 30, 2016, ECF No. 22.

On August 25, 2016, this Court granted in part and denied in part Porsche's motion to dismiss. *Butler v. Porsche Cars N.A.*, 2016 WL 4474630 (N.D. Cal. Aug. 25, 2016). Specifically, the Court held that Plaintiff had adequately alleged that the "defect in the wiring harness posed a safety hazard that gave rise to a duty to disclose the defect." *Id.* at *4. The Court also held that Plaintiff adequately alleged that Porsche had knowledge of the defect at the time that Plaintiff's car was originally sold in May 2007, and that Plaintiff satisfied the "transaction" requirement of

the CLRA. *Id.* at *5–6. However, the Court concluded that Plaintiff lacked standing to seek an injunction compelling Porsche to replace the wiring harness because Plaintiff had already replaced his faulty wiring harness with a "next-generation" wiring harness, and there were no allegations that Plaintiff's new wiring harness was defective. *Id.* at *8.

On September 7, 2016, Plaintiff filed a FAC, which maintained the same causes of action but removed Plaintiff's request for injunctive relief. *See* FAC. On September 26, 2016, Porsche answered the FAC. ECF No. 40.

On January 26, 2017, Plaintiff filed a motion for class certification, in an addition to a sealing motion. ECF Nos. 44 & 45 ("Mot."). Plaintiff's motion for class certification seeks to certify the following proposed classes:

- **CLRA Class:** All natural persons who purchased a Porsche 911 vehicle of model year 2005 through model year 2008 (manufactured before February 2008) in California for personal use.

- **UCL Subclass:** All natural persons who purchased a Porsche 911 vehicle of model year 2005 through model year 2008 (manufactured before February 2008) in California for personal use, and who paid a PCNA factory-authorized dealership for replacement of the Alternator Starter cable for their vehicles.

Plaintiff excludes from both of these classes employees, officers, or agents of Defendant, in addition to judicial officers assigned to this case.

On March 9, 2017, Porsche filed an opposition, in addition to a sealing motion. *See* ECF No. 50 ("Opp."). On April 6, 2017, Plaintiff filed a reply and a sealing motion. *See* ECF No. 58 ("Reply").

On April 12, 2017, the Court denied without prejudice the parties' sealing motions. ECF No. 60.

On April 13, 2017, Porsche filed a motion for leave to file a surreply in further opposition to Plaintiff's motion for class certification. ECF No. 61. As Porsche explained, Plaintiff took the deposition of Dr. Stephan Schmitt ("Schmitt") on March 24, 2017, after Porsche filed its opposition in this case. *See id.*, Ex. B ("Schmitt Dep."). Plaintiff's reply relies on Schmitt's deposition, and thus Plaintiff's reply raises arguments and evidence to which Porsche has not yet

had the opportunity to respond. Thus, the Court GRANTS Porsche's motion to file a surreply, and considers Porsche's surreply to the extent that Porsche's surreply addresses Plaintiff's arguments regarding Schmitt's testimony. However, to the extent Defendant's surreply addresses arguments regarding class members' knowledge of the defect before purchase, the Court does not consider these arguments. These arguments are not in response to new arguments or evidence raised in the Reply.

On April 14, 2017, Plaintiff filed a response to Porsche's surreply, which the Court also considers for purposes of the instant motion. ECF No. 62.

## II.  LEGAL STANDARD

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure. Rule 23 does not set forth a mere pleading standard. To obtain class certification, Plaintiffs bear the burden of showing that they have met each of the four requirements of Rule 23(a) and at least one subsection of Rule 23(b). *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186, *amended by* 273 F.3d 1266 (9th Cir. 2001). "A party seeking class certification must affirmatively demonstrate . . . compliance with the Rule[.]" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Rule 23(a) provides that a district court may certify a class only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). That is, the class must satisfy the requirements of numerosity, commonality, typicality, and adequacy of representation to maintain a class action. *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).

If all four prerequisites of Rule 23(a) are satisfied, the Court must also find that Plaintiff "satisf[ies] through evidentiary proof" at least one of the three subsections of Rule 23(b). *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1242 (2013). Rule 23(b) sets forth three general types of class actions. *See* Fed. R. Civ. P. 23(b)(1)-(3). Of these types, Plaintiff seeks

certification under Rule 23(b)(3). The Court can certify a class under Rule 23(b)(3) if the Court finds that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and effectively adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"[A] court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim[.]" *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194 (2013) (quoting *Dukes*, 564 U.S. at 351); *see also Mazza*, 666 F.3d at 588 ("'Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23.'" (quoting *Zinser*, 253 F.3d at 1186)). This "rigorous" analysis applies to both Rule 23(a) and Rule 23(b). *Comcast*, 133 S. Ct. at 1432 (stating that Congress included "addition[al] . . . procedural safeguards for (b)(3) class members beyond those provided for (b)(1) or (b)(2) class members (e.g., an opportunity to opt out)" and that a court has a "duty to take a 'close look' at whether common questions predominate over individual ones").

Nevertheless, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 133 S. Ct. at 1194–95. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1195. If a court concludes that the moving party has met its burden of proof, then the court has broad discretion to certify the class. *Zinser*, 253 F.3d at 1186.

## III.    DISCUSSION

As set forth above, Plaintiff brings a CLRA claim against Porsche and seeks to certify a CLRA class of "[a]ll natural persons who purchased a Porsche 911 vehicle of model year 2005 through model year 2008 (manufactured before February 2008) in California for personal use." Mot. at 4. Plaintiff also brings a UCL claim against Porsche for restitution, and Plaintiff seeks certification of a UCL subclass of "[a]ll natural persons who purchased a Porsche 911 vehicle of model year 2005 through model year 2008 (manufactured before February 2008) in California for

United States District Court
Northern District of California

personal use, and who paid a PCNA factory-authorized dealership for replacement of the Alternator Starter cable for their vehicles." *Id.*

Porsche does not contest that Plaintiff has satisfied the requirements of Rule 23(a), as evidenced by the fact that Porsche's brief in opposition does not address the issue. *See generally* Opp. Accordingly, the Court turns directly to Rule 23(b)(3)'s requirement of predominance, which is the primary subject of the parties' briefing. For the reasons discussed below, the Court concludes that class certification is not appropriate in this case because Plaintiff has not met his burden to show that common questions predominate over individual questions. The Court first discusses the principles governing the predominance analysis, and then the Court applies these principles to the parties' predominance arguments.

## A. Principles Governing the Predominance Analysis

Under Rule 23(b)(3), plaintiffs must show "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "The Rule 23(b)(3) predominance inquiry" is meant to "tes[t] whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The Ninth Circuit has held that "there is clear justification for handling the dispute on a representative rather than an individual basis" if "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication." *Hanlon*, 150 F.3d at 1022. In ruling on a motion for class certification based on Rule 23(b)(3), a district court must conduct a rigorous analysis to determine whether the class representatives have satisfied both the predominance and superiority requirements. *See Zinser*, 253 F.3d at 1186. The predominance analysis focuses on "the legal or factual questions that qualify each class member's case as a genuine controversy" to determine "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623; *see also* Fed. R. Civ. P. 23(b)(3) (to certify a class, the court must find that "questions of law or fact common to class members predominate over any questions affecting only individual members").

8

This Court has previously identified five principles that guide the Court's predominance inquiry:

> First, and most importantly, the critical question that this Court must answer is whether common questions predominate over individual questions. *Amgen*, 133 S. Ct. at 1191. In essence, this Court must determine whether common evidence and common methodology could be used to prove the elements of the underlying cause of action. *Id.* Second, in answering this question, this Court must conduct a "rigorous" analysis. *Comcast Corp.*, 133 S. Ct. at 1432. This analysis may overlap with the merits, but the inquiry cannot require Plaintiffs to prove elements of their substantive case at the class certification stage. *Amgen*, 133 S. Ct. at 1194. Third, this Court must determine not only the admissibility of expert evidence that forms the basis of the methodology that demonstrates whether common questions predominate. *Ellis*, 657 F.3d at 982. Rather, this Court must also determine whether that expert evidence is persuasive, which may require the Court to resolve methodological disputes. *Id.*; *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 9244, 255 (D.C. Cir. 2013)]. Fourth, the predominance inquiry is not a mechanical inquiry of "bean counting" to determine whether there are more individual questions than common questions. *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013). Instead, the inquiry contemplates a qualitative assessment, which includes a hard look at the soundness of statistical models. *Id.*; *In re Rail Freights Fuel Surcharge Antitrust Litig.*, 725 F.3d at 255. Fifth, Plaintiffs are not required to show that each element of the underlying cause of action is susceptible to classwide proof. *Amgen*, 133 S. Ct. at 1196. Rather, they need only show that common questions will predominate with respect to their class as a whole. *Id.*

*In re High-Tech Empl. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1186 – 87 (N.D. Cal. 2013). With these principles in mind, the Court turns to Plaintiff's motion.

**B.  Application of the Predominance Standard**

Plaintiff argues that class certification is appropriate for Plaintiff's CLRA and UCL classes because the following issues raise common, predominating questions: (1) the existence of a defect; (2) Porsche's duty to disclose the defect; (3) Porsche's knowledge of the defect; (4) class members' reliance on Porsche's omissions; (5) and class members' harm or injury. *See* Mot. at 10–17.

Porsche argues, by contrast, that individualized issues will predominate over any common issues because (1) there is no common, class-wide defect in all Class Vehicles; (2) a class-wide

9

presumption of exposure and reliance is not appropriate in this case; (3) many class members' claims are time-barred; and (4) many class members purchased their vehicle before Porsche had knowledge of the defect. *See generally* Opp. Porsche also contests Plaintiff's damages model. *Id.* at 20.

The Court first considers the parties' dispute over the nature of the defect in this case. The Court then turns to the parties' arguments regarding exposure and reliance. As discussed further below, the Court finds that these three issues generate individualized questions such that, as a whole, individualized issues predominate over any common issues in this case.

**1. Existence of a Class-Wide Defect**

The theory of harm underlying Plaintiff's claims is that class members suffered injury because class members purchased a vehicle that contained an undisclosed defect. *See, e.g.*, FAC ¶ 31. Accordingly, as Plaintiff and Porsche acknowledge, the existence of a defect in all Class Vehicles is an essential element of the class's CLRA and UCL claims. Mot. at 14; Opp. at 9. Plaintiff asserts that this element may be established on a class-wide basis because the wiring harness defect is the result of "a design flaw" that is present in *all* Class Vehicles at the time of manufacture. Reply at 4; *see also* Mot. at 10.

Porsche asserts however, that Plaintiff has produced no evidence of a class-wide defect. To the contrary, Porsche asserts that unrebutted evidence shows that the alleged defect is the result of a manufacturing abnormality of the wiring harness that affected some, but not all, class vehicles. Opp. at 9. Porsche also contends that, because a next-generation wiring harness was available that corrected the defect, and because some class members purchased used vehicles with a next-generation wiring harness, some class members purchased a vehicle that did not contain the faulty wiring harness. *Id*. at 19. Accordingly, some unknown number of class members received precisely what they paid for: a car without a defective wiring harness. *Id.*

For the reasons discussed below, the Court agrees with Porsche that, based on the evidence before the Court, Plaintiff has not met his burden to show that common issues predominate over individual issues regarding the existence of a defect. The Court first considers the nature of the

defect in this case, and then considers the issue of class members who purchased a used Class Vehicle with a next-generation wiring harness.

### a. Nature of the Defect

First, the Court considers the nature of the defect asserted in this case, and whether Plaintiff has met his burden to show that the defect is ubiquitous across the class.

In general, courts have found consumer fraud claims amenable to class-wide treatment where the claims were premised on the existence of a common, class-wide defect present in all of the relevant products at the time of sale. *See Wolin v. Jaguar Land Rover N.A., LLC*, 617 F.3d 1168, 1173 (9th Cir. 2010) (finding commonality and predominance where all "vehicles were sold with an alignment defect," even though the defect had not manifested in all class vehicles). By contrast, courts have found class treatment inappropriate where "the relevant components of a device differ" across class members such that "proof that one device is defective may not lend itself to establishing that another device is defective." *Grodzitsky v. Am. Honda Motor Co., Inc.*, 2014 WL 718431, at *5 (C.D. Cal. Feb. 19, 2014). Similarly, courts have denied class certification where the evidence suggested the defect may be the result of an "isolated" manufacturing defect, rather than a ubiquitous defect that exists in all of the relevant products purchased by the class. *Arabian v. Sony Elecs. Inc.*, 2007 WL 627977, at *13 (S.D. Cal. Feb. 22, 2007).

Plaintiff contends that this case is "tailor made for class certification" because the alleged defect in this case is a design defect that is present in all Class Vehicles. Mot. at 2, 10; Reply at 4. Specifically, Plaintiff contends that all Class Vehicles contain a defectively designed wiring harness, and thus the existence of the defect is common across the class. *Id.* at 10. However, for the reasons discussed below, the Court finds that Plaintiff has failed to meet his burden to show that the predominance requirement has been met regarding the existence of a class-wide defect.

Significantly, Plaintiff has failed to clearly articulate what, precisely, is defective about the wiring harness's design. Rather, Plaintiff offers only the conclusory assertion that "there is a design flaw in the alternator-starter cable," and Plaintiff relies almost exclusively on the

11

United States District Court
Northern District of California

conclusions drawn in the Gould report. *See* Reply at 4; Mot. at 10–12. As set forth above, the Gould report was prepared in August 2007 during Porsche's early investigation into the defect. The Gould report concluded that "[t]he poor electrical connection [in the wiring harness] is probably the result of the much lower electrical conductivity of the brass terminal (28%) when compared to copper and less than perfect crimping of the terminal to the 25 mm cable. . . . The use of a 25 mm stranded copper cable to carry the potential current capacity of the 15 ampere alternator is questionable as well." Gould Report, at 4; *see also* Mot. at 12. Plaintiff relies on Gould's conclusion to show that there is a "common defect plaguing the Class Vehicles." Mot. at 13.

However, the Gould report's conclusion is ambiguous as to the precise cause and nature of the defect in this case. First, the Gould report is labeled "pre-analysis," and the Gould report was prepared in August 2007 as part of an early internal investigation into the defect for Porsche North America. *See* Gould Report, at 2. Gould explains his conclusions in the report with language such as "probably" and "appears to be." *Id.* at 4. Second, and more significantly, Gould identified three factors as probable or possible contributors to the wiring harness defect: (1) the use of a brass terminal; (2) "less than perfect crimping of the [brass] terminal" to the copper cable; and (3) the "questionable" use of a copper cable itself. *See id.* The Gould report does not explain the extent to which these factors contribute to the defect, and Plaintiff also does not explain whether and to what extent Plaintiff believes that all three of these factors, as opposed to only one or two, makes the wiring harness's design defective. Further, it is unclear from the Gould report whether these factors are, indeed, a result of a design defect common across all Class Vehicles, as opposed to manufacturing abnormalities. Again, Plaintiff provides no further explanation of the defect, and Plaintiff has not produced an expert to opine on the nature or cause of the defect in this case.

Significantly, Porsche has introduced the declaration of Dr. Stephan Schmitt ("Schmitt"), a mechanical engineer and Director of Development Material Technology at Porsche AG, which is the manufacturer of Porsche vehicles. *See* ECF No. 50-6 ("Schmit Decl."). According to Schmitt, he conducted a further investigation into the defect for Porsche AG in November 2007, after the

Gould report's conclusions were elevated from Porsche North America to Porsche AG. *Id.* ¶ 9. Schmitt concluded during his November 2007 investigation that the wiring harness defect was the result of a "unique" manufacturing abnormality, not a design defect. *See id.* ¶ 13. Specifically, Schmitt found that the wiring harness defect was caused by the "less than perfect crimping" of the copper wire to the brass terminal lug, which is a factor that the Gould report identified. *See* Gould Report at 4; Schmitt Decl. ¶ 11. After conducting further investigation into the cause of the imperfect crimping, Schmitt concluded that "the design for the parts and for the crimping of the starter shoe were effective." Schmitt Decl. ¶ 12. However, the crimp was not effective "when debris from a prior manufacturing process for the harness [was] deposited on the cable lug or press, or when other foreign material [got] lodged into the press." *Id.* ¶ 13. Although Schmitt found that, "in most cases, the resulting deviations in air spaces" caused by excess debris did "not significantly impact the electrical flow to the battery and engine," "if sufficient unexpected material [wa]s present, the air spaces" permitted oxidization. *Id.*

Based on Schmitt's conclusions about the defect, "in late 2007," Schmitt recommended that Porsche make two changes to the wiring harness. First, Schmitt recommended improvements in production to eliminate the instances of imperfect crimping. *Id.* ¶ 15. Second, "[a]s a further backup," Schmitt also recommended that Porsche AG make changes to the wiring harness itself in order to achieve more effective crimping. *See* Schmitt Decl. ¶¶ 15–16 (detailing changes to the starter shoe which would "keep[] the cable strands more closely together before crimping"). Porsche made these two changes in January 2008, and thus Porsche 911 vehicles manufactured after January 2008 contain a "next-generation" wiring harness that incorporate these two changes. *See* Meltzer Dep., at 5; Schmitt Decl. ¶¶ 15–16; *see also* Opp. at 4.

Plaintiff has not produced any rebuttal to Schmitt's explanation of the defect. Rather, Plaintiff states only that a jury could choose to disbelieve Schmitt's description of the defect, and could choose instead to credit the Gould report. Reply at 1–3. However, it is Plaintiff's burden to "affirmatively demonstrate" that common issues predominate over individual issues regarding a class-wide defect. *See Dukes*, 564 U.S. at 350. As discussed above, Plaintiff has not clearly

articulated what about the wiring harness is defectively designed, and the Gould report is ambiguous as to the precise nature and cause of the defect in this case.

Moreover, contrary to Plaintiff's assertion, Schmitt's explanation of the defect is not necessarily inconsistent with the Gould report. As an initial matter, Schmitt conducted his investigation for Porsche AG in November 2007, which is *after* Gould's initial conclusions were elevated from Porsche North America to Porsche AG for further investigation. Schmitt Decl. ¶ 9; *see also* Meltzer Dep. at 5 (explaining the process of elevating the problem to Porsche AG for further analysis). As discussed above, the Gould report is labeled "pre-analysis," and Gould uses tentative language to discuss his conclusion. *See* Gould Report at 2–4. Furthermore, the Gould report does not analyze or explain whether the other factors that Gould identified—such as the use of a brass terminal lug—could, on their own, contribute to the defect in the absence of an imperfect crimp. *See id.* Thus, the Gould report does not necessarily contradict the conclusion that Schmitt reached in his further investigation into the defect, which is that the use of a brass terminal lug would not, on its own, cause the defect if not for an imperfect crimp. Schmitt Dep., at 45–46 ("[T]he design of a brass cable lug and copper wire is correct, but if the crimped connection is insufficient, then there will be a poor electrical connection or poor charging."). The Gould report also did not investigate or explain the cause of the imperfect crimping that Gould identified, and thus the Gould report does not contradict Schmitt's conclusion that the cause of the imperfect crimping was a manufacturing abnormality, rather than a design defect. Indeed, Plaintiff himself does not explain whether Plaintiff believes imperfect crimping to be a factor in causing the wiring harness defect, and Plaintiff does not explain what causes imperfect crimping if not for the manufacturing abnormality that Schmitt identified. *See generally* Mot.

Finally, other evidence in the record is also consistent with Schmitt's declaration. Notably, after Schmitt reached his conclusions in 2007 regarding the nature and source of the defect, Schmitt recommended in late 2007 that (1) "several steps be undertaken to improve the crimps in future production," and (2) that Porsche make changes to the wiring harness itself to achieve more effective crimping. *See* Schmitt Decl. ¶¶ 15–16. Porsche instituted these two "countermeasures"

14

1    in January 2008, which resulted in Porsche using a next-generation wiring harness in Porsche 911

2    vehicles manufactured after January 2008.  Meltzer Dep., at 5; *see* Schmitt Decl. ¶ 15–16.

3    Plaintiff does not contest that Porsche's changes in January 2008 corrected the defect.  *See, e.g.*,

4    FAC ¶ 15 (stating that Porsche corrected the defect in January 2008).  That Schmitt's

5    recommendations were effective in correcting the defect lends support to Schmitt's conclusions

6    about the nature and source of the defect.  Moreover, Schmitt's description of the defect is

7    consistent with the deposition testimony of Meltzer, Porsche's 30(b)(6) representative, who

8    testified that the wiring harness defect was the result of a "process abnormality" that Porsche

9    "corrected at the supplier," in addition to making changes to the wiring harness itself.  Meltzer

10   Dep., at 5.  Plaintiff himself relies on Meltzer's testimony in Plaintiff's motion for class

11   certification, and Plaintiff offers no evidence or testimony to contradict Meltzer.  *See* Mot. at 15.

12          In sum, Plaintiff has offered only the conclusory assertion that the wiring harness is

13   defective in design, and Plaintiff relies on the ambiguous conclusions of the Gould report.  At the

14   same time, Porsche has introduced evidence that the wiring harness defect is a result of a

15   manufacturing abnormality that is not ubiquitous across the class, and Plaintiff has failed to rebut

16   this evidence.  Accordingly, based on the evidence before the Court, the Court finds that Plaintiff

17   has failed to meet his burden to "affirmatively demonstrate" that common issues predominate over

18   individual issues regarding a class-wide defect.  *Dukes*, 564 U.S. at 350; *see Arabian*, 2007 WL

19   627977, at *12 (denying class certification where the plaintiffs failed to provide evidence to

20   support the plaintiffs' assertion that a class-wide defect existed in all class members' laptops).  Of

21   course, "nothing in the record definitively *precludes* an ultimate finding of a common defect," and

22   the "Court makes no determination regarding the merits of Plaintiffs' claims."  *Arabian*, 2007 WL

23   627977, at *12.  However, for purposes of class certification, "Plaintiff[] ha[s] failed to

24   demonstrate that a fact-intensive inquiry will not be required of many, if not all, of the members of

25   the proposed Class."  *Id.*  Given that the existence of a common design defect is a central

26   component of Plaintiff's CLRA and UCL claims, this alone defeats a finding of predominance in

27   this case.  *Id.*

28
                                                    15

### b. Class Members Who Purchased a Used Car with a Replaced Wire Harnesses

Furthermore, even assuming that Plaintiff is correct that there is a common defect across the class, the Court finds that individualized inquiries will nonetheless be required to determine whether Class Members purchased a Class Vehicle with the wiring harness defect. Specifically, individualized inquiries would be required to determine whether Class Members purchased a used Class Vehicle that was equipped with a next-generation wiring harness, rather than the original faulty wiring harness.

In January 2008, Porsche made two changes to correct the wiring harness defect: (1) changes to the manufacturing process; and (2) changes to the wiring harness itself to reduce instances of imperfect crimping. Meltzer Dep., at 5; Schmitt Decl. ¶¶ 15–16. These changes resulted in a "next-generation" wiring harness, which Porsche used in vehicles manufactured after January 2008. Meltzer Dep., at 5. A next-generation wiring harness can also be installed in a Class Vehicle as a replacement for the original, faulty wiring harness. *Id.* Indeed, Plaintiff himself had his faulty wiring harness replaced with a next-generation harness in 2015. *Butler v. Porsche Cars N.A., Inc.*, 2016 WL 4474630, at *8 (N.D. Cal. Aug. 25, 2016) (finding Plaintiff did not have standing to seek injunctive relief because Plaintiff had his wiring harness replaced in 2015 and Plaintiff had experienced no further issues regarding the charging of his battery).

Significantly, the original owner of a Class Vehicle could have replaced the faulty wiring harness with a next-generation wiring harness, and then sold the vehicle with the next-generation wiring harness installed. Indeed, Porsche introduces evidence of these sales. *See* ECF No. 53-7 ("Strombom Rep."), at 27–28 (detailing instances in which owners had the next-generation wiring harness installed, and then sold the vehicle to subsequent owners).

As a purchaser of a Class Vehicle, the original owner would be a member of the CLRA class, which is defined as "persons who purchased a Porsche 911 vehicle of model year 2005 through model year 2008 (manufactured before February 2008)." *See* Mot. at 1. Further, because the original owner had the faulty wiring harness replaced, the original owner would be a member of the UCL sub-class, which is defined as Class Vehicle purchasers "who paid a PCNA factory-

16

authorized dealership for replacement" of the wiring harness with the next-generation wiring harness. *Id.*

Importantly, the subsequent purchaser of that same Class Vehicle would also be a person "who purchased a Porsche 911 vehicle of model year 2005 through model year 2008 (manufactured before February 2008)," and thus would be a member of the CLRA class. Mot. at 1. However, despite being a member of the CLRA class, the subsequent purchaser of the Class Vehicle would have suffered no legally cognizable injury. *Id.* To the contrary, the subsequent purchaser would have "received exactly what they paid for—that is a vehicle with" a non-defective wiring harness. *See In re Toyota Motor Corp. Hybrid Brake Marketing, Sales Practices & Prods. Liab. Litig.*, 288 F.R.D. 445, 450 (C.D. Cal. 2013) (denying class certification where many class members presumably "suffered no actual injury"). Accordingly, even assuming that Plaintiff is correct that there is a common design defect across all Class Vehicles, the Court will nonetheless need to conduct individualized inquiries to know whether a class member purchased a used Class Vehicle with a next-generation wiring harness. For this additional reason, the Court finds that individualized inquiries predominate regarding whether members of the CLRA class purchased a Class Vehicle that was equipped with a defective wiring harness at the time of purchase.

### 2. Exposure and Reliance

The Court next addresses Porsche's argument that individualized inquiries will predominate regarding exposure and reliance upon Porsche's alleged omissions. Both the CLRA and the UCL require "at a minimum, that the class be exposed to the allegedly false" representations or omissions at issue. *Ehret v. Uber Tech., Inc.*, 148 F. Supp. 3d 884, 901 (N.D. Cal. 2015) (quoting *Davis-Miller v. Automobile Club of So. Cal.*, 201 Cal. App. 4th 106, 124–25 (Cal. Ct. App. 2011)); *see Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) ("[C]lass certification of UCL claims is available only to those class members who were actually exposed to the business practices at issue"). The CLRA requires "an additional showing of reliance." *Ehret*, 148 F. Supp. at 901 (internal quotation marks omitted). "To prove reliance on an

17

omission, a plaintiff must show that the defendant's nondisclosure was an immediate cause of the plaintiff's injury-producing conduct." *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015). "A plaintiff may do so by simply proving 'that, had the omitted information been disclosed, one *would have been aware of it* and behaved differently.'" *Id.* (quoting *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1093 (1993)) (emphasis added). In short, in CLRA and UCL cases, "common issues predominate when plaintiffs are exposed to [a] common set of representations about a product." *Waller v. Hewlett-Packard Co.*, 295 F.R.D. 472, 486 (S.D. Cal. 2013); *see also Mazza*, 666 F.3d at 595–96 (finding district court erred in CLRA and UCL case by certifying class of individuals that were not uniformly exposed to representations and omissions of Honda).

Plaintiff bases his UCL and CLRA claims on Plaintiff's allegation that "Porsche never made any disclosure to consumers or the putative class members about the defect plaguing the Class Vehicles." FAC ¶ 13. Thus, Plaintiff brings his UCL and CLRA claims under an omissions theory. In general, district courts have found exposure and reliance to be "amenable to class-wide resolution" in CLRA and UCL omission based cases where, for example, all members of the class "interact[ed] with an authorized Ford dealer prior to purchase," and thus all class members would have "been aware of a disclosure" from Ford about the defect at the point of sale. *See Daniel v. Ford Motor Co.*, 2016 WL 8077932, at *8 (E.D. Cal. Sept. 23, 2016). Similarly, district courts have found exposure and reliance suitable for class-wide resolution in cases where the class was defined as all purchasers of a product and the plaintiffs' CLRA and UCL claims were based on information omitted from the product's packaging. In these cases, all class members were "necessarily exposed" to the defendant's omissions on the package prior to purchase, and all class members would have been aware of a disclosure on the packaging had a disclosure been made. *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1105 (C.D. Cal. Aug. 14, 2015) (collecting cases).

By contrast, district courts have found that individualized issues predominated over common issues in UCL and CLRA cases where "the information to which class members were exposed was not uniform," *Philips*, 2016 WL 7428810, at *16, and where the "evidence

Case No. 16-CV-2042-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION

establish[ed] that awareness of a disclosure would almost certainly vary from consumer to consumer." *Webb v. Carter's, Inc.*, 272 F.R.D. 489, 502 (C.D. Cal. 2011); *see also English v. Apple, Inc.*, 2016 WL 1188200, at *12 (N.D. Cal. Jan 5, 2016) (denying motion for class certification where the plaintiff alleged Apple omitted material information in its discussions with consumers, but the plaintiff failed to establish "that the way in which Apple employees talk about the service plans [wa]s sufficiently uniform").

The Court agrees with Porsche that Plaintiff has not met his burden to show that exposure and reliance are amenable to class-wide treatment in this case. Significantly, although Plaintiff asserts that Porsche "failed to disclose th[e] defect to Plaintiff or members of the putative class," *see* FAC ¶ 29, Plaintiff never explains *where* Porsche should have disclosed the defect to class members. *See generally* FAC; Mot. at 14. Moreover, because Plaintiff never clearly defines the nature of the defect in this case, Plaintiff also never clearly defines *what* information Porsche failed to disclose to consumers. Furthermore, Plaintiff never states what Porsche material class members viewed prior to purchase, or whether class members interacted with a Porsche representative prior to purchase. In the absence of any such allegations or evidence, Plaintiff has given the Court no basis to find that all class members were exposed to a Porsche representation with omissions, or that class members "would have been aware" of a disclosure about the defect from Porsche in a common way had a disclosure been made. *Daniel*, 2016 WL 8077932, at *8.

Indeed, given the range of purchasing situations across the class, some class members were likely *not* exposed to a Porsche representation with omissions, and would likely *not* have "been aware of" a disclosure from Porsche had a disclosure been made. *See id.* Specifically, Plaintiff's proposed class definition includes individuals who purchased a Class Vehicle from an authorized Porsche dealership, in addition to individuals who purchased a used Class Vehicle from a third party in a private sale. Although a class member who purchased a Class Vehicle from a Porsche dealership would have interacted with a Porsche representative and viewed material from Porsche—such as stickers on the vehicle or brochures about the vehicle—prior to purchase, a class member who purchased a used Class Vehicle from a third party may not have interacted with a

19

Porsche representative *at all* prior to purchase, and indeed may not have viewed *any* material or advertisements from Porsche. Given the potential range of purchasing situations across the class, "awareness of a disclosure [from Porsche] would almost certainly vary from consumer to consumer." *See Webb*, 272 F.R.D. at 502.

Plaintiff has produced no allegations or evidence to suggest otherwise. As explained above, Plaintiff has not clearly explained *what* information Porsche omitted, and Plaintiff has not stated *where* Porsche should have disclosed the information. Moreover, Plaintiff has failed to explain what Porsche materials class members viewed prior to purchase, or how class members otherwise interacted with Porsche prior to purchase. Accordingly, this case is not like *Daniel*, where the plaintiffs alleged that Ford omitted information about the defect at the point of sale, and where all class members had commonly interacted with a Ford representative at the point of sale. *Daniel*, 2016 WL 8077932, at *8. This case is also not like CLRA and UCL omission cases premised on omissions on a product's packaging, where all class members purchased the product and were "necessarily exposed" to the defendant's omissions prior to purchase in the same way. *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d at 1105 (internal quotation marks omitted). In contrast to these cases, Plaintiff has provided no basis to believe that class members interacted with Porsche in a sufficiently "cohes[ive]" way such that class members were commonly exposed to a Porsche representation with omissions—wherever those omissions occurred—or that class members would have been aware of a disclosure from Porsche had a disclosure been made. *See Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011).

Again, it is Plaintiff's burden to "affirmatively demonstrate" that class certification is appropriate. *See Dukes*, 564 U.S. at 350 ("A party seeking class certification must affirmatively demonstrate . . . compliance with the Rule."). Based on the current record, the Court can only speculate regarding the nature of the omission in this case, and whether exposure to and reliance upon Porsche's omission can be proven on a class-wide basis. Thus, Plaintiff has failed to meet his burden to show that the elements of exposure and reliance are amenable to class-wide proof. As the Court explained in *Philips*, "[t]his alone warrants the denial of class certification." *Philips*,

20

2016 WL 7428810, at *16 (denying class certification of CLRA and fraudulent concealment claims where the Court found that "class members were exposed to "quite disparate information" prior to purchasing their vehicles from Ford).

**C.      Summary**

In sum, the Court finds that Plaintiff has failed to identify the defect in this case, and Plaintiff has failed to show that the alleged defect exists in all class vehicles. Accordingly, Plaintiff has not met his burden to show that common issues about the defect predominate over individualized inquiries. Because the existence of a class-wide defect is central to Plaintiff's claims under the UCL and CLRA, this alone defeats predominance. Moreover, the Court also concludes that Plaintiff has not met his burden to show that Plaintiff's exposure to and reliance upon Porsche's alleged omissions are amenable to class-wide treatment. For this additional reason, the predominance requirement is not met, and the Court need not reach Porsche's remaining arguments.

**IV.     CONCLUSION**

For the foregoing reasons, the Court DENIES Plaintiff's motion for class certification under Rule 23(b)(3).

**IT IS SO ORDERED.**


Dated: April 19, 2017

_____
LUCY H. KOH
United States District Judge

Case No. 16-CV-2042-LHK
ORDER DENYING MOTION FOR CLASS CERTIFICATION